**In the United States District Court
for the District of Kansas**

———————

Case No. 23-cv-2165-TC

———————

BRADLEY J. CHILELLI,

*Plaintiff*

v.

SIGNIFY NORTH AMERICA CORPORATION,

*Defendant*

———————

**MEMORANDUM AND ORDER**

Plaintiff Bradley Chilelli sued Defendant Signify North America Corporation after he fell at Signify's facility. Doc. 1. Signify has filed two motions, one to strike Chilelli's expert witness, Doc. 49, and another for summary judgment, Doc. 51. Chilelli opposes both motions. Docs. 55 & 56. For the following reasons, Signify's motion for summary judgment is granted, and its motion to exclude Chilelli's expert is denied as moot.

**I**

**A**

Summary judgment is proper under the Federal Rules of Civil Procedure when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" when it is necessary to resolve a claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). And disputes over material facts are "genuine" if the competing evidence would permit a reasonable jury to decide the issue in either party's favor. *Id.* Disputes—even hotly contested ones—over facts that are not essential to the claims are irrelevant. *Brown v. Perez*, 835 F.3d 1223, 1233 (10th Cir. 2016). Indeed,

belaboring such disputes undermines the efficiency Rule 56 seeks to promote. *Adler*, 144 F.3d at 670.

At the summary judgment stage, material facts "must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671; *see also* D. Kan. R. 56.1(d). To determine whether a genuine dispute exists, the court views all evidence, and draws all reasonable inferences, in the light most favorable to the nonmoving party. *See Allen v. Muskogee, Okla.*, 119 F.3d 837, 839–40 (10th Cir. 1997). That said, the nonmoving party cannot create a genuine factual dispute by making allegations that are purely conclusory, *Adler*, 144 F.3d at 671–72, 674, or unsupported by the record. *See Scott v. Harris*, 550 U.S. 372, 378–81 (2007).

The moving party bears the initial burden of showing the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues as to those dispositive matters remain for trial. *Celotex*, 477 U.S. at 324; *Savant Homes*, 809 F.3d at 1137.

**B**

Signify provides "quality light products, systems, and services." Doc. 52 at 5.[1] It owned a facility in Salina, Kansas wherein it manufactured light bulbs until it sold the facility in 2021. *Id.* at ¶¶ 2, 5. As part of that sale, two furnaces at the facility's glass plant had to be demolished. *Id.* Signify shut down the furnaces so they could cool before demolition. *Id.* at ¶ 3. After the shutdown, there were roughly 100 Signify employees left in the facility, with only ten of them working at the gas plant. *Id.* at ¶¶ 4, 5.

Signify conducted a bidding process for the demolition work. Doc. 52 at ¶ 7. Hosea Project Movers won the bid. *Id.* at ¶ 21. Hosea is a "full-time industrial relocation expert" that provides services for the moving and closing of factories, including demolition. *Id.* at ¶¶ 9, 10, 13. Signify and Hosea contracted for the demolition of the furnaces.

---

[1] All document citations are to the document and page number assigned in the CM/ECF system.

*Id.* at ¶ 21. As part of the contract, Hosea accepted responsibility for safety in the project. *Id.* at ¶ 33.

Signify had a safety policy, the Signify On-Site Contractor Safety Standards (SOCSMR), that governed independent contractors at Signify sites. Doc. 56-2. The SOCSMR set out various safety requirements that independent contractors had to follow. *Id.* And it noted that Signify's Site Safety Officer was responsible for "injury prevention" at Signify's sites. *Id.* at 2.

Chilelli, who worked for Hosea, was part of Hosea's four-man crew that was demolishing the furnaces at Signify's plant. Doc. 52 at ¶¶ 35–37. Kevin Ellis was the crew's foreman. *Id.* Signify had no employees working to demolish the furnaces. *Id.* at ¶ 38. Only one Signify employee, David Goldammer, was around the Hosea crew. Goldammer was Signify's manufacturing manager. *Id.* at ¶ 84. He would check in on the Hosea crew each morning to see their progress. *Id.* at ¶¶ 95, 96. Goldammer never entered Hosea's immediate work area. *Id.* at ¶ 97. Instead, he would "look from the perimeter, and he never got close enough to observe Hosea's work." *Id.*

One of the two furnaces, a gas oxy furnace, had four funnels (also called troughs or bowls). Doc. 52 at ¶ 71. Each trough was connected to a hole on the second-floor catwalk. During the manufacturing process, glass would pass through the trough and through the hole on the catwalk down to the floor below. *Id.* at ¶ 71. In early June, the Hosea crew removed some troughs as part of the demolition, thereby leaving the holes exposed. *Id.* at ¶¶ 72, 73. Removal of the troughs was part of what Signify hired Hosea to do. *Id.* at ¶¶ 19, 72. After they removed the troughs, the Hosea crew used the holes as trash chutes to dump debris from the second-floor catwalk to the ground floor. *Id.* at ¶¶ 79, 80, 81. The crew would throw debris through the hole down to the ground floor as it worked on the second-floor catwalk. *Id.*

On June 29, Chilelli fell through an exposed trough hole. Doc. 52 at ¶ 104. He was gravely injured and rendered paraplegic. Doc. 56 at 22. After the fall, Signify created an accident narrative that recommended—despite the fact that the facility had been shut down as part of a sale—implementing the SOCSMR at the Salina facility. *Id.* at ¶¶ 113, 116.

Chilelli filed suit claiming that Signify was negligent because it "failed to exercise reasonable care in its oversight, supervision,

3

training, inspection and enforcement of the mandatory safety requirements it created and imposed on contractors." Doc. 48 at ¶ 4.a. Signify filed a motion for summary judgment, arguing it did not owe Chilelli a duty under Kansas law. Doc. 51.

## II

There is no dispute that Signify was unaware of the hole, that the hole was open and obvious, that Chilelli knew about it, and that Signify did not retain control of the project. Under Kansas law, Signify owed Chilelli no duty of care. As a result, Chilelli's claim against Signify fails as a matter of law and Signify's motion for summary judgment is granted.

### A

To recover for negligence, Kansas law requires a plaintiff to prove a duty owed, a breach of that duty, injury, and a causal connection between the duty breached and the injury suffered.[2] *Thomas v. Cty. Comm'rs of Shawnee Cty.*, 262 P.3d 336, 346 (Kan. 2011). Whether a duty exists is a question of law. *Elstun v. Spangles, Inc.*, 217 P.3d 450, 453 (Kan. 2009) (citing *Nero v. Kansas State Univ.*, 861 P.2d 768, 772 (Kan. 1993)). A negligence claim fails if the defendant had no duty to act in a certain manner toward the plaintiff. *Id.*

There can be no duty where the probability of harm is not foreseeable. *Berry v. Nat'l Med. Servs., Inc.*, 257 P.3d 287, 290 (Kan. 2011). Although ordinarily a question of fact, foreseeability may be determined as a matter of law if there is no genuine dispute of material fact. *See Cullip ex rel. Pitts v. Domann ex rel. Domann*, 972 P.2d 776, 785 (Kan. 1999). To establish a duty, the plaintiff must show that the defendant knew about the condition or that the condition existed for so long that the defendant should have known about it. *Corazzin v. Edward D. Jones & Co., L.P.*, 530 P.3d 445, 494 (Kan. 2023); *Brock v. Richmond-Berea Cemetery Dist.*, 957 P.2d 505, 511 (Kan. 1998).

**1.** Signify argues it did not owe Chilelli a duty of care because it did not know about the exposed trough hole. Doc. 52 at 27. Signify insists

---

[2] A federal court sitting in diversity applies the substantive law of the state in which it sits, as enacted by the state legislature and interpreted by the state's highest court. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

4

that "[b]ecause no Signify employees knew or had reason to know about the uncovered and unguarded hole in use by the Hosea crew, the probability of a fall through the hole was not foreseeable to Signify." *Id.*

There is no evidence to suggest that Signify knew about the exposed trough hole. Signify had shut down the Salina facility before the sale, and only 100 employees remained. Doc. 52 at ¶¶ 4, 5. Of those, only ten worked in the area where the Hosea crew was demolishing the glass oxy furnace. *Id.* at 6. The only Signify employee who was near the furnace, and therefore the only one who could have been able to notice the exposed trough hole, was Goldammer. But there is no dispute that Goldammer did not know about the trough hole until after Chilelli's fall. *Id.* at ¶ 101. Goldammer did not enter the Hosea crew's immediate work area. *Id.* He never got close enough to observe the crew's work and would only "occasionally" walk by to ask the foreman how the work was progressing. *Id.* at ¶¶ 95, 96, 97.

Chilelli's attempt to controvert these facts is unavailing. He argues that, pursuant to the SOCSMR, Goldammer "was the person responsible for performing safety inspections and supervision over the Hosea [ ] crew." Doc. 56 at ¶¶ 97, 98. This fact does not bear on whether Signify owed Chilelli a duty of care vis-à-vis Goldammer's knowledge of the trough hole. *See Christy v. Travelers Indem. Co. of Am.*, 810 F.3d 1220, 1233 (10th Cir. 2016) (quoting *Travis v. Park City Mun. Corp.*, 565 F.3d 1252, 1257–58 (10th Cir. 2009) ("To survive summary judgment, a nonmoving party must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which he carries the burden of proof."). Even assuming that Chilelli's reading of the SOCSMR is correct, that Goldammer was supposed to perform safety inspections and supervise the Hosea crew does not mean he knew about the trough hole. Indeed, the record is clear that Goldammer found out about the trough hole after Chilelli's fall. Doc. 52 at ¶ 100. Chilelli does not dispute this fact. Doc. 56 at ¶ 100. As a result, Chilelli fails to raise a genuine dispute that Signify knew about the trough hole. This entitles Signify to summary judgment because "[i]f no duty exists, there can be no negligence." *Fountain v. Se-Kan Asphalt Servs., Inc.*, 837 P.2d 835, 838 (Kan. Ct. App. 1992); *see Corazzin*, 530 P.3d at 452 (affirming the trial court's grant of summary judgment where the plaintiff failed to create a genuine issue of material fact that the defendant knew about the defect that injured him).

5

**2.** Signify further argues that, even assuming *arguendo* it knew about the trough hole, it did not owe Chilelli a duty because the hole was a known and obvious risk. Doc. 52 at 30. It posits that the hole was known and obvious to the Hosea crew because "they uncovered it and/or because they were aware of it and used it." *Id.*

In Kansas, landowners have no duty to warn or make safe dangerous conditions that are known or obvious to the plaintiff. *Bonnette v. Triple D. Auto Parts Inc.*, 409 P.3d 865, 871 (Kan. Ct. App. 2017); *Miller v. Zep. Mfg. Co.*, 815 P.2d 506, 514 (Kan. 1991) ("[A] possessor of land is under no duty to remove known and obvious dangers."). Kansas law dictates an objective test to determine whether a danger is known and obvious. *Wellhausen v. Univ. of Kansas*, 189 P.3d 1181, 1184 (Kan. 2008). The word "known" denotes both knowledge of the condition and appreciation of its danger. Restatement (Second) of Torts ¶ 343A (1965); *see Bonnette*, 409 P.3d at 871 (using the Restatement's definition). And "obvious" means that the condition and the risk are apparent to and would be recognized by a reasonable man in the plaintiff's position who exercised ordinary care, intelligence, and judgment. *Bonnette*, 409 P.3d at 871.

There is no dispute that the hole was known and obvious. Signify hired Hosea to demolish the gas oxy furnace, which included removing the troughs. Doc. 52 at ¶ 72. It is undisputed that the holes were covered by troughs. *Id.* at ¶ 71; Doc. 56 at ¶ 71. The Hosea crew removed the troughs, thereby exposing the holes. Doc 52 at ¶¶ 72, 73. They walked by the holes "almost daily." *Id.* at ¶ 77. Subsequently, the four-man crew, of which Chilelli was a member, began to use the holes as chutes to dump trash down to a dumpster on the ground floor. *Id.* at ¶¶ 79, 80, 81. When asked if he knew about the holes, Chilelli noted that he had previously filmed the hole through which he fell while it had a trough on it. *Id.* at ¶ 78. The hole was conspicuous, measuring roughly three squared feet. *Id.* at ¶ 75. And as Chilelli admits, he knew that "there was danger." Doc. 52 at ¶ 58. A reasonable person in his position would have been aware of the peril of falling through the holes. Accordingly, Signify owed Chilelli no duty of care with respect to a hole that, because he and his crew had exposed and used it, was known and obvious to him. *See Manley v. Hallbauer*, 387 P.3d 185, 188 (Kan. Ct. App. 2016) (finding no duty where the danger of approaching an obstructed intersection was known and obvious to the plaintiff); *Wilson v. Daytec Const. Co.*, 916 P.2d 72, 74 (Kan. Ct. App. 1996) (finding no duty where the plaintiff slipped on paint without injury and then

walked through the area again and slipped a second time); *see also Knowles v. Klase*, 460 P.2d 444, 446 (Kan. 1969) ("When a dangerous condition is neither created by the proprietor or those for whom he is responsible, nor traceable to their actions, proof of negligence with respect to a floor condition requires some showing they had actual or constructive notice of the dangerous condition.").

Chilelli's attempts to controvert that the trough hole was known and obvious are unpersuasive. He contends that Ellis testified that the Hosea crew "did not make the hole through which Chilelli fell . . .." Doc. 56 at ¶ 72. When asked at his deposition whether the hole was already there, Ellis responded: "Yeah. We didn't make no holes in there, no." Doc. 56-7 at 13–14. This much is true, and there is no argument to the contrary. Signify does not contend that the Hosea crew created the trough hole. The issue is not whether they created the hole but rather whether they exposed it by removing the trough that had previously covered it. Chilelli does not dispute that the hole was covered by a trough, Doc. 52 at ¶ 71; Doc. 56 at ¶ 71, and there is no genuine dispute that the Hosea crew, as part of their demolition work, removed the troughs and exposed the holes. Doc. 52 at ¶ 72. Both Ellis and Chilelli admitted in their depositions that the Hosea crew removed the troughs. *See* Doc. 56-7 at 11 ("And is it your testimony today that Hosea disassembled or removed those bowls? Eventually, yes, we did."); Doc. 52-9 at 13 ("[W]e started to disassemble some troughs that were all steel and firebrick.").

Chilelli also argues that Ellis testified that Signify workers covered some of the trough holes. Doc. 56 at ¶ 72. After Chilelli's fall, Ellis told an OSHA representative that "[t]hey covered one of the other holes but cannot remember if the hole where the accident occurred was exposed." Doc. 56-7 at 4. When questioned in his deposition about who "they" were, Ellis replied: "Signify workers." *Id.* But counsel's very next question to Ellis was whether he "[spoke] to Signify workers to determine that." *Id.* Ellis replied: "No, just assumed." *Id.* This unsupported assumption does not controvert the fact that the trough hole was known and obvious. At best, it indicates that Signify covered the trough holes and therefore knew about them. Chilelli points to no evidence in the record that raises a dispute of material fact that the trough hole was not known and obvious.

Finally, Chilelli refutes that the Hosea crew used the trough holes to dump trash. Doc. 56 at ¶ 72. He notes that when Ellis confirmed this fact he referred to "them holes" rather than the specific hole

through which Chilelli fell. *Id.*; *see* Doc. 52-11 at 7 ("[W]e would just use them holes to get it down to the next floor to keep working."). This mischaracterizes Ellis's testimony. Counsel specifically asked Ellis whether the Hosea crew used the hole through which Chilelli fell. *See* Doc. 52-11 at 7 ("[T]here was some testimony . . . that crew members were using that hole to toss debris down."). Ellis's use of the pronoun "them" does not negate his assent to counsel's question, and he did not clarify that the crew did not use the specific hole through which Chilelli fell. Furthermore, Todd Hosea, Hosea Project Movers's president, testified that the crew used the holes to dump debris. Doc. 52 at ¶ 81.[3] And Chilelli himself said in his statement to OSHA that the hole "may have been used to toss debris down to the level below for cleanup." *Id.* at ¶ 80. There is no genuine dispute that the Hosea crew used the trough hole to dump trash. Even if there were, it remains undisputed that the crew exposed the hole by removing the trough.

**3.** Finally, Signify argues that it did not owe Chilelli a duty because Hosea was a demolitions expert that Signify hired specially for the job. Doc. 52 at 32. Signify maintains that it had no control over the Hosea crew's work or the premises wherein they worked. *Id.*

"In a premises liability case, in order to be liable, the party charged must have had control over the premises in question." *Gragg v. Wichita State Univ.*, 934 P.2d 121, 130 (Kan. 1997) (quoting *Rogers v. Omega*, 883 P.2d 1204, 1207 (Kan. Ct. App. 1994)); *see also Rogers*, 883 P.2d at 1208 (finding that the defendant had no duty because its agreement with the plaintiff placed no responsibility or control over the dangerous condition on the defendant). "To put it another way, a party may not be held

---

[3] Chilelli objects to the admissibility of Todd Hosea's testimony because he "was not present at the facility on the day of the fall" and so his testimony was not based on personal knowledge. Doc. 56 at ¶ 73. Todd Hosea was noticed as Hosea Project Movers's corporate representative. Doc. 35. Pursuant to Federal Rule of Civil Procedure 30(b)(6), a corporate representative must "testify about information known or reasonably available to the organization." Fed. R. Civ. P. 30(b)(6). When giving such testimony, Todd Hosea's personal knowledge is "of no consequence." *Sprint Commc'ns Co., L.P. v. Theglobe.com, Inc.*, 236 F.R.D. 524, 528 (D. Kan. 2006); *see Ecclesiastes 9:10-11-12, Inc. v. LMC Holding Co.* 497 F.3d 1135, 1146–47 (10th Cir. 2007) (quoting Roger Fendrich & Kent Sinclair, *Discovering Corporate Knowledge and Contentions*, 50 ALA. L. REV. 651, 665 (1999) ("[I]n one common scenario, corporations designate individuals who lack personal knowledge of the events giving rise to the litigation but who have otherwise been educated about it.")).

responsible for a condition which he or she did not cause and which he or she has no ability to remedy." *Gragg*, 934 P.2d at 130.

There is no dispute that Signify had no control over the Hosea crew's work. Signify did not supervise the crew. Doc. 52 at ¶¶ 33, 38, 44. Goldammer was supposed to supervise the crew only if he noticed any unsafe behavior. *Id.* at ¶ 94. Chilelli points to nothing in the record that suggests Goldammer had noticed such unsafe behavior prior to this incident. And Hosea was a demolitions expert. *Id.* at ¶¶ 9, 13. The fact that Signify hired Hosea specially for the demolition work cuts against the finding of a duty. *See Aspelin v. Mounkes*, 476 P.2d 620, 623 (Kan. 1970) (noting that "an owner of premises is under no duty to protect an independent contractor from risks arising from or intimately connected with defects in the premises which the contractor has undertaken to repair"); *Didde v. City of Chapman*, 283 P.3d 840, 2012 WL 3822735, *5 (Kan. Ct. App. 2012) (quoting *Guignet v. Lawrence Paper Co., Inc.*, 859 F. Supp. 515, 519 (D. Kan. 1994)) (finding no duty where an independent contractor was injured by a pipe that he was hired to install).

Chilelli's attempt to controvert these facts fails. His only argument points to Goldammer's title of "Project Leader." He argues that, as project leader, Goldammer "was the person who was supposed to meet with the HPM crew prior to any work beginning to review various aspects of safety . . .." Doc. 56 at ¶ 26. And he notes that Goldammer admitted to having the authority to stop "unsafe acts or operations." *Id.* But it is uncontroverted that Signify was not supervising the Hosea crew. Doc. 52 at ¶¶ 33, 38, 44. Goldammer was to stop work only if he saw any unsafe behavior, and there is nothing in the record to suggest that he noticed anything of the sort.

**4.** Chilelli insists that Signify owed him a duty. He makes two points: that the SOCSMR imposed a duty on Signify and that, if Signify had implemented its subsequent corrective actions before Chilelli fell, the accident would not have occurred. Neither of these arguments suffices to create a duty under Kansas tort law.

Chilelli first argues that the SOCSMR imposed a duty on Signify. Doc. 56 at 26, 33. That policy set out "mandatory safety requirements to be met by contractors performing their services on Signify premises." Doc. 56-2 at 1. Signify was supposed to police its independent contractors to ensure they were complying with the SOCSMR. *Id.*

9

The parties vigorously dispute whether the SOCSMR applied to the Salina plant. Chilelli points to the plain language of the policy, which states that the SOCSMR applies to "[a]ll Signify sites." Doc. 56-2 at 1; Doc. 56 at ¶ 116. Signify retorts that the SOCSMR was not implemented in the Salina facility due to diminished manpower. Doc. 52 at ¶¶ 114, 115, 116; Doc. 58 at 3–4.

It is immaterial whether the SOCSMR applied to the Salina facility because, even if it did, Signify's failure to abide by its own internal safety policies does not create a duty under Kansas tort law. *See South ex rel. S. v. McCarter*, 119 P.3d 1, 10–11 (Kan. 2005) (finding that a landlord's failure to follow its rental agreement and community guidelines did not impose a duty to protect its tenants); *Cunningham v. Braum's Ice Cream & Dairy Stores*, 80 P.3d 35, 37 (finding no duty where a store failed to abide by its tornado emergency plan); *Beshears ex rel. Reiman v. Unified Sch. Dist. No. 305*, 930 P.2d 1376, 1383 (Kan. 1997) (finding no duty where a school failed to abide by its own suspension policies); *see also Glynos v. Jagoda*, 819 P.2d 1202, 1211 (Kan. 1991) (finding no duty where a landlord failed to update his premises to comply with changing building codes). And Chilelli has not argued that he relied on the SOCSMR. *Cf. Sall v. T's, Inc.*, 136 P.3d 471, 482 (Kan. 2006) (finding liability where the plaintiff relied on the defendant's policy of using air horns to signal bad weather). Thus, Chilelli fails to raise an issue of material fact that Signify owed him a duty because of the SOCSMR.

**5.** Chilelli also argues that Signify should have implemented its corrective actions earlier. He notes that "if, as required by Signify following [his] injury, Signify had insisted on [the corrective actions] . . . the opening in the catwalk would have been identified as a safety hazard and it would have been corrected." Doc. 56 at 29–30.

This has no bearing on the duty analysis. For one, both Kansas law and the Federal Rules of Evidence prohibit the use of subsequent remedial measures to show negligence or culpability. F.R.E. 407; Kan. Stat. Ann. § 60-451; *see also Henning v. Union Pacific R. Co.*, 530 F.3d 1206, 1220 (10th Cir. 2008) (affirming the district court's exclusion of subsequent remedial measures under Rule 407). And in any event, the question is whether Signify owed Chilelli a duty when he fell. The argument that Signify owed him a duty before the accident based on actions that it took after the accident turns tort law on its head—chronologically, it places the breach of a duty before the birth of that duty. Signify's behavior after Chilelli's accident cannot retroactively impose a duty on Signify. *See* Restatement of Torts § 4 (1934) ("[T]he actor's

10

duty in tort is often to conduct himself in a manner, the propriety of which is to be determined ex post facto by the jury in their determination as to whether the actor has or has not used reasonable care."). "Negligence is not actionable unless it involves the invasion of a legally protected interest, the violation of a right. Proof of negligence in the air, so to speak, will not do." *Palsgraf v. Long Island R. Co.*, 162 N.E. 99, 99 (N.Y. 1928). The legally protected interest must exist at the time of the actionable conduct. *See Cansler v. State*, 675 P.2d 57, 61 (Kan. 1984) (quoting *Hanna v. Huer, Johns, Neel, Rivers & Webb*, 662 P.2d 243, 254 (Kan. 1983) ("For negligence to exist there must be a duty and a breach thereof before the conduct becomes actionable.")). Chilelli cites no authority to the contrary.

### III

For the foregoing reasons, Signify's Motion for Summary Judgment, Doc. 51, is GRANTED, and its Motion to Strike Plaintiff's Expert, Doc. 49, is DENIED as moot.

It is so ordered.

Date: January 30, 2025     s/ Toby Crouse
                            Toby Crouse
                            United States District Judge